UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PATRICK S.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:21-cv-02179-TWP-MJD |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

Claimant Patrick S. requests judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act") and Supplemental Security Income ("SSI") under Title XVI of the Act. *See* 42 U.S.C. § 423(d); 42 U.S.C. § 1382. On April 12, 2022, Chief Judge Tanya Walton Pratt designated the undersigned Magistrate Judge to issue a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). [Dkt. 14.] For the reasons set forth below, the Magistrate Judge **RECOMMENDS** that the Court **REVERSE** the decision of the Commissioner.

---

[1] In an attempt to protect the privacy interest of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, the Southern District of Indiana has opted to use only the first name and last initial of non-governmental parties in its Social Security judicial review opinions.

## I. Background

Claimant applied for DIB and SSI in September 2019, alleging an onset of disability as of June 30, 2019. [Dkt. 7-5 at 21.] Claimant's applications were denied initially and again upon reconsideration, and a hearing was held before Administrative Law Judge Therese Tobin ("ALJ") on December 4, 2020. [Dkt. 7-2 at 34.] On February 1, 2021, ALJ Tobin issued her determination that Claimant was not disabled. [Dkt. 7-2 at 15.] The Appeals Council then denied Claimant's request for review on June 1, 2021. [Dkt. 7-2 at 2.] On August 4, 2021, Claimant timely filed his Complaint in this Court seeking judicial review of the ALJ's decision. [Dkt. 1.]

## II. Legal Standards

To be eligible for benefits, a claimant must have a disability pursuant to 42 U.S.C. § 423.[2] Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To determine whether a claimant is disabled, the Commissioner, as represented by the ALJ, employs a sequential, five-step analysis: (1) if the claimant is engaged in substantial gainful activity, he is not disabled; (2) if the claimant does not have a "severe" impairment, one that significantly limits his ability to perform basic work activities, he is not disabled; (3) if the claimant's impairment or combination of impairments meets or medically equals any impairment appearing in the Listing of Impairments, 20 CFR pt. 404, subpart P, App. 1, the claimant is

---

[2] DIB and SSI claims are governed by separate statutes and regulations that are identical in all respects relevant to this case. For the sake of simplicity, this Entry contains citations to those that apply to DIB.

disabled; (4) if the claimant is not found to be disabled at step three, and is able to perform his past relevant work, he is not disabled; and (5) if the claimant is not found to be disabled at step three, cannot perform his past relevant work, but can perform certain other available work, he is not disabled. 20 CFR § 404.1520. Before continuing to step four, the ALJ must assess the claimant's residual functional capacity ("RFC") by "incorporat[ing] all of the claimant's limitations supported by the medical record." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019).

In reviewing a claimant's appeal, the Court will reverse only "if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020). Thus, an ALJ's decision "will be upheld if supported by substantial evidence," which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). An ALJ need not address every piece of evidence but must provide a "logical bridge" between the evidence and his conclusions. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015). This Court may not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Where substantial evidence supports the ALJ's disability determination, the Court must affirm the decision even if "reasonable minds could differ" on whether the claimant is disabled. *Id.*

### III. ALJ Decision

ALJ Tobin first determined that Claimant had not engaged in substantial gainful activity since his alleged onset date of June 30, 2019. [Dkt. 7-2 at 21.] At step two, the ALJ found that Claimant had the following severe impairments: "diabetes mellitus with diabetic polyneuropathy;

depression;[3] anxiety; obesity; osteoarthritis—knee; low back pain; and chronic obstructive pulmonary disease." [Dkt. 7-2 at 21.] The ALJ determined that Claimant's essential hypertension and hyperlipidemia were non-severe. [Dkt. 7-2 at 21.] At step three, the ALJ found that Claimant's impairments did not meet or medically equal a listed impairment during the relevant time period. [Dkt. 7-2 at 21.] ALJ Tobin then found that, during the relevant time period, Claimant had the residual functional capacity ("RFC")

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can occasionally be exposed to extreme cold and extreme heat. He can have occasional exposure to dust, odors, fumes, and pulmonary irritants. He is limited to performing simple and routine tasks. He can have occasional contact with supervisors, coworkers and the public.

[Dkt. 7-2 at 23.]

At step four, ALJ Tobin found that Claimant was unable to perform any of his past relevant work during the relevant time period. [Dkt. 7-2 at 28.] At step five, relying on testimony from a vocational expert ("VE"), the ALJ determined that Claimant was able to perform jobs that exist in significant numbers in the national economy, such as night patrol inspector (DOT 824.683-010), inspector (DOT 727.687-062), and night cleaner (DOT 323.687-014). [Dkt. 7-2 at 28-29.] Accordingly, ALJ Tobin concluded that Claimant was not disabled. [Dkt. 7-2 at 29.]

## IV. Discussion

Claimant's brief is bursting with intertwined reasons in support of his request to reverse the ALJ's decision, all of which are primarily based on "cherry-picked evidence" and the absence

---

[3] It is important to recognize that Claimant does not just suffer from "depression," but has been routinely diagnosed with "moderate episode of recurrent major depressive disorder." *See, e.g.,* [Dkt. 7-7 at 2, 14, 41, 83].

of a logical bridge.[4] [Dkt. 9.] In response, the Commissioner argues that reversal is inappropriate because Claimant failed to meet his burden of proving he was disabled and, in any case, the ALJ based her decision on substantial evidence. [Dkt. 11.] Ultimately, the undersigned agrees with Claimant that ALJ Tobin's decision is deficient in many respects, with the most compelling reasons discussed below.

### A. The ALJ Erred by Formulating an Unsupported RFC Without Subjecting Claimant's Medical Evidence to Expert Scrutiny

The Court begins with Claimant's arguments that the ALJ erroneously crafted her decision without any medical input and that her RFC determination was unsupported. [Dkt. 9 at 9, 19.] As noted, Claimant first applied for DIB and SSI in September 2019. His claim was initially reviewed by State agency consultants J. Sands, MD, and Joelle Larsen, Ph.D., in November 2019. In finding that Claimant had no medically determinable impairments, Dr. Sands and Dr. Larsen stated that "Claimant refused to cooperate with the request to provide information and the determination made is based on evidence in file." [Dkt. 7-3 at 5.] It appears the only evidence received at that point was a single primary care treatment note from September 2019. Claimant's file was reconsidered by State agency consultants Shayne Small, MD, and Donna Unversaw, Ph.D., in February 2020. In affirming the initial assessment, Dr. Small and Dr. Unversaw noted that Claimant "again did not return forms." [Dkt. 7-3 at 17.] It appears the only additional evidence received at that point was another primary care treatment note from January

---

[4] Claimant advances the following four argument headings: (1) the ALJ erred in crafting the decision without the benefit of any medical opinions; (2) the ALJ erred in assessing Claimant's symptoms; (3) the RFC is not supported and lacks an accurate and logical bridge; and (4) the ALJ's ultimate decision is unsupported. However, within each argument, Claimant provides even more sub-arguments—many of which overlap with one another. For this reason, the Court has streamlined the parties' arguments after carefully considering each point raised in Claimant's brief, [Dkt. 9], the Commissioner's response, [Dkt. 11], and Claimant's reply, [Dkt. 12].

2020. Exhibits 1A through 3F were later admitted into evidence at Claimant's hearing in December 2020. *See* [Dkt. 7-2 at 37]. Additional evidence was subsequently submitted, and the record was complete on January 18, 2021. *See* [Dkt. 7-6 at 62-64; Dkt. 7-2 at 18-19]. As a result, the majority of Claimant's treatment records were submitted well after the State agency consultants reviewed his file. Claimant therefore argues that, since there were no medical opinions issued in this case, "the entire decision was based on the ALJ's lay interpretation of the evidence." [Dkt. 9 at 9.]

The Seventh Circuit has made clear that "ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves." *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014); *cf. Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014); *Stage v. Colvin*, 812 F.3d 1121, 1125-26 (7th Cir. 2016); *Akin v. Berryhill*, 887 F.3d 314, 317-18 (7th Cir. 2018); *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018). The reasoning for this rule is sound: without the benefit of an expert opinion, ALJs are simply not qualified to make their own medical determinations. *Akin*, 887 F.3d at 318. To remedy the lack of sufficient medical evidence, the regulations encourage ALJs to recontact a claimant's medical sources, request additional existing evidence, ask the claimant to undergo a consultative examination at the Agency's expense, and/or ask the claimant or others for more information. 20 CFR § 404.1520b(b)(2).

Here, it was appropriate for the State agency consultants to make a determination based on the limited evidence they had. *See* 20 CFR § 404.1516. ALJ Tobin then found their opinions "unpersuasive," recognizing that the State agency consultants did not possess the entirety of the evidence—indeed, they possessed hardly any, and thus their "opinions" can hardly be considered opinions at all. [Dkt. 7-2 at 27.] However, these are the only expert opinions in the record; the

ALJ did not subject the majority of Claimant's medical evidence to expert scrutiny and Claimant did not provide a treating source statement. Because new and potentially decisive evidence was received after the consultants provided their opinions, the ALJ was obligated to seek additional medical opinion evidence. *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018) (citing *Stage*, 812 F.3d at 1125; *Goins*, 764 F.3d at 680). ALJ Tobin did not; instead, she apparently interpreted the significance of almost all of Claimant's medical records entirely on her own. As Claimant underscores, the ALJ's decision was based wholly on her own lay interpretation of the evidence—an undertaking which ALJ Tobin was not permitted, let alone qualified, to do.

In response, the Commissioner argues that, without any request from Claimant's counsel, "the ALJ did not bear the *sua sponte* burden of hiring yet more experts to review the records." [Dkt. 11 at 9.] This reasoning essentially amounts to a waiver argument, but "Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000); 20 CFR 404.900(b). "It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Id.* at 111 (citing *Richardson v. Perales*, 402 U.S. 389, 400-01 (1971)); *see Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000) ("[T]he procedure for adjudicating social security disability claims departs from the adversary model to the extent of requiring the administrative law judge to summon a medical expert if that is necessary to provide an informed basis for determining whether the claimant is disabled.") (citing 20 CFR § 416.927(a)(3)). Indeed, "[a]n ALJ is under an obligation to develop a 'full and fair record.'" *Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014) (citing *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000)). Moreover, to the extent the Commissioner takes issue with the absence of a treating source opinion in the record, a claimant's burden "is to produce evidence, not opinions." *Kemplen v. Saul*, 844 Fed. App'x 883, 887 (7th Cir. 2021); *see Scott v. Astrue*, 647 F.3d 734, 741 (7th Cir.

2011) ("If the ALJ found this evidence insufficient, it was her responsibility to recognize the need for additional medical evaluations."). It seems painfully obvious in this case that ALJ Tobin should have "obtained a medical opinion based on a complete record." *Stage*, 812 F.3d at 1126.

Ultimately, the circumstances at hand amount to an ALJ unilaterally interpreting a claimant's entire medical record without any input from a medical expert. Critically, though, ALJs must rely on medical experts to interpret medical evidence. *McHenry*, 911 F.3d at 871. The opposite occurred here, leading to ALJ Tobin playing doctor—"a clear no-no," as the Seventh Circuit has routinely admonished. *Goins*, 764 F.3d at 680 (citations omitted).

In addition to failing to obtain any medical opinion evidence to assist in understanding the medical evidence of record, the ALJ also failed to provide any explanation of the basis for her RFC determination. ALJ Tobin determined that Claimant had the RFC

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can occasionally be exposed to extreme cold and extreme heat. He can have occasional exposure to dust, odors, fumes, and pulmonary irritants. He is limited to performing simple and routine tasks. He can have occasional contact with supervisors, coworkers and the public.

[Dkt. 7-2 at 23.] Critically, the ALJ provides no analysis whatsoever regarding how she reached the specific limitations assessed in the RFC determination. Indeed, her entire RFC explanation is merely a partial summary of the record evidence, but "[a] summary is not analysis, as it does not explain *why* the evidence summarized undermined Plaintiff's statements about his symptoms or limitations, or which statements were inconsistent." *Michael v. Saul*, 2021 WL 1811736, at *8 (N.D. Ind. May 6, 2021) (emphasis in original) (citing *Craft v. Astrue*, 539 F.3d 668, 677-78 (7th Cir. 2008)). The ALJ provides no reasoning for why Claimant's RFC is devoid of any postural restrictions, or how she reached the determination that Claimant—who the ALJ determined had a severe impairment of chronic obstructive pulmonary disease—could occasionally be exposed to

extreme cold, extreme heat, dust, odors, fumes, and pulmonary irritants. To be sure, if ALJ Tobin determined that Claimant in fact did not require any postural limitations at all—despite also finding severe physical impairments including obesity, osteoarthritis of his knee, low back pain, and chronic obstructive pulmonary disease—she should have said so and explained the grounds for that belief. Further, the ALJ does not provide a narrative discussion with citations to evidence in the record to explain how the restrictions to "simple and routine tasks" and "occasional contact with supervisors, coworkers, and the public" were derived, nor how they account for Claimant's severe mental impairments, as required under Social Security Ruling 96-8p. As a result, the evidentiary basis of the ALJ's RFC determination is wholly unclear. The undersigned therefore recommends that remand is necessary to correct these errors.

### B. The ALJ Erred by Failing to Articulate Sufficient Reasons for Discrediting Claimant's Subjective Symptoms

Claimant additionally argues that ALJ Tobin erred in her assessment of Claimant's subjective symptoms. [Dkt. 9 at 14.] The Commissioner responds that the ALJ provided "supportable reasons for concluding that Plaintiff had not accurately described his limitations." [Dkt. 11 at 20.]

Pursuant to Social Security Ruling 16-3p, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *3. Once established, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id.* Social Security Ruling 16-3p, which rescinded Social Security Ruling 96-7p on March 28, 2016, requires that the ALJ assess a claimant's subjective symptoms, but not his credibility. *Id.* at

\*2. The "change in wording is meant to clarify that [ALJs] aren't in the business of impeaching claimants' character; obviously [ALJs] will continue to assess the credibility of pain *assertions* by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (emphasis in original); *see also Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015) (noting that an ALJ erred in "her belief that complaints of pain, to be credible, must be confirmed by diagnostic tests"). At stage two of the SSR 16-3p analysis, the ALJ must consider the claimant's alleged symptoms in light of his daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; treatment other than medication for relief of pain; and other measures taken to relieve pain. 20 CFR § 404.1529(c)(3).

At his hearing before ALJ Tobin, Claimant testified that although he "would like to" work a full-time job, he is unable to do so because "trying to lift and stand for any amount of time, it's impossible." [Dkt. 7-2 at 44.] When asked how much weight he could lift or carry comfortably, Claimant responded "[m]aybe 15 pounds, maybe. I don't know. I don't, I don't lift a whole lot. I try, I mean, but it's—if I try lifting, usually there's pressure going down into my feet." [Dkt. 7-2 at 51.] He explained that, when standing, "I feel like I'm walking on coals, or glass, hot coals or glass, and the pain just shoots up from my feet to my knees, to my legs, and then my legs like, the thighs start to go numb. And then my hands start to tingle. . . . When they start tingling, I tend to drop stuff." [Dkt. 7-2 at 44.] This occurs "on and off all through the day." [Dkt. 7-2 at 47.] Claimant testified that his typical daily pain level is a 10 out of 10. [Dkt. 7-2 at 51.] Propping his feet up helps to relieve the pain in his feet "a little bit, but not a lot." [Dkt. 7-2 at 50.] He also bought himself a cane that he uses to help relieve the pressure in his feet. [Dkt. 7-

10

2 at 51.] Claimant testified, "I have shooting pain that it feels like somebody's beating me with a ball bat, throughout the whole day, in my back. It just, there's nothing I can do about it." [Dkt. 7-2 at 52.] He admitted he "should be going to physical therapy," but noted "I'm scared to leave the house because of some of the medicines they got me on." [Dkt. 7-2 at 45.] Claimant testified that he lives with a friend and, although he tries to do the dishes, "I last about ten minutes standing at the sink, and then I feel like I've been on my feet for 12 hours. . . . I got to sit down after about ten minutes."[5] [Dkt. 7-2 at 46.] He explained, "after I'm sitting for a couple, maybe a couple of hours, an hour or so, I get up for a few minutes, and then it's back at it again. I'm sitting back down again." [Dkt. 7-2 at 47.] Claimant also testified that, due to his type 2 diabetes, he uses the restroom "[a]nywhere from 12 to 15 times a day." [Dkt. 7-2 at 48.] He further testified that, after two rounds of x-rays of his left knee, his doctor told him that "within a year I would be needing total knee replacement." [Dkt. 7-2 at 43.] He receives a steroid injection in his knee "every three months," and expects to do so until he has the surgery. [Dkt. 7-2 at 48.] He is also on a nebulizer for his breathing issues and performs breathing treatments two-to-four times a day, each of which lasts for 15-to-20 minutes.[6] [Dkt. 7-2 at 49.]

Additionally, Claimant testified that his mental impairments also affect his ability to work, stating, "I don't like being around people. . . . but I have days where I'm—good days and bad days. I have a good day where I'm smiling, I'm happy, and then the next minute I'm bawling like a baby. And then maybe the next day, or two hours later, I feel like I'm ready to kill something. . . . I'm just very irritated with everything." [Dkt. 7-2 at 45.] He further testified that

---

[5] If this testimony were fully credited, it clearly would preclude the range of light work encompassed by the ALJ's RFC. See 20 CFR 404.1567(b).
[6] Again, if this testimony were fully credited, it likely would preclude all work pursuant to the VE's testimony regarding off-task behavior. See [Dkt. 7-2 at 55].

"I don't go out unless . . . I absolutely have to," and that "[e]very day" is a day "where I'm just, I just don't want to be around anybody." [Dkt. 7-2 at 49-50.]

The relevant passages concerning ALJ Tobin's evaluation of Claimant's subjective symptoms are as follows:

> The claimant testified he cannot work a full time job because it is difficult for him to lift, stand and carry items. He indicated he can drop items on occasion. He further indicated he does not like being around people and has crying spells. He indicated he has good and bad days. He indicated he does not like to be around people and is irritated by everything. (Hearing testimony). The claimant indicated he lives with a friend right now and tries to do the dishes. The claimant indicated he lifts 15 pounds. (Hearing testimony). The claimant indicated he used a cane that was not prescribed. (Id.). The claimant indicated he hurt his back 20 years ago and he still has shooting pain in his back. (Id.). When asked by his counsel what his typical pain level was on a day to day basis, the claimant giggled, answering 10/10. Notably, the undersigned finds this inconsistent with his demeanor in testimony. Furthermore, on examinations, he was reportedly in no distress on multiple examinations, except for when he had pneumonia. (2F/7, 25, 28, 38). The claimant's treatment has been conservative, despite his primary care doctor continually recommending he see an orthopedist. The claimant alleged in testimony he uses the restroom 15 times a day; however, he never reported this frequency of elimination on examination. (See 1F-4F).
>
> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.
>
> As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent with the objective medical evidence.[7]

---

[7] It should be well understood by now that an ALJ may not reject statements about the intensity, persistence, and limiting effects of a claimant's pain solely because the available objective evidence does not substantiate the claimant's statements. 20 CFR § 404.1529(c)(2); *see also Hill v. Colvin,* 807 F.3d 862, 869 (7th Cir. 2015) ("But [the claimant] *testified* that she is more limited, and her testimony cannot be disregarded simply because it is not corroborated by objective medical evidence.") (emphasis in original) (citing *Hall,* 778 F.3d at 691; *Pierce v. Colvin,* 739 F.3d 1046, 1049-50 (7th Cir. 2014); *Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 883 (9th Cir. 2006)).

[Dkt. 7-2 at 24] (footnote added).

Critically, the ALJ does not specify what she found to be inconsistent between Claimant's testimony and the record evidence. The only "inconsistency" she implicitly references is the statement that "claimant alleged in testimony he uses the restroom 15 times a day; however, he **never** reported this frequency of elimination on examination." [Dkt. 7-2 at 24] (emphasis added). This is not accurate; Claimant reported polydipsia (excessive thirst) and polyuria (excessive urination) as a result of his diabetes on June 5, 2019, and again on July 22, 2020. [Dkt. 7-7 at 34, 144.] This mischaracterization of the record demonstrates "why ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves." *Moon*, 763 F.3d at 722.

The ALJ also appears to reject Claimant's testimony that his pain severity was regularly 10/10 on the basis of his "demeanor." Typically, ALJs "are in the best position to see and hear the witnesses and assess their forthrightness," and thus their credibility determinations are afforded special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, the Seventh Circuit condemns the "sit and squirm" test when determining credibility. *Id.* at 436 ("We doubt the probative value of any evidence that can be so easily manipulated as watching whether someone acts like they are in discomfort."). In this regard, it is especially noteworthy that Claimant's hearing was held telephonically due to the COVID-19 pandemic. ALJ Tobin thus could not see Claimant to observe his demeanor, which makes this factor considerably less

salient. In any case, the Court is unsure why Claimant's "giggling" undercuts the severity of his pain.[8]

Additionally, the ALJ notes (multiple times throughout her decision) that Claimant was "reportedly in no distress on multiple examinations." Heavy reliance on the term "no acute distress" in claimants' medical charts is an unfortunately common practice among ALJs, especially in cases, like here, where the ALJ does not base her findings on the opinions of medical experts. As Claimant points out, "[w]ithout an explanation of what the recording medical professionals means by 'no acute distress,' it cannot be simply assumed, as the ALJ did, that they meant that [Claimant] did not experience . . . pain to the degree that [he] alleged." *Wanserki v. Colvin*, 2015 WL 5692521, at *7 (S.D. Ind. Sept. 28, 2015). Indeed, "[t]o physicians, 'No Acute Distress' means that your patient will probably not become unstable in the next 5 minutes." *Id.* (citing Dave Chauvin, DO, & Lisa Hohler, CPC, *Physician Documentation – No Acute Distress*," PREMIER PHYSICIAN SERVS. (Feb. 14, 2013)). Conversely, being in acute distress typically "implies being on the knife-edge" and is used "as an indicator of imminent demise." Howard Rodenberg, MD, MPH, CCDS, *Guest post: Distressing terminology*, ACDIS (Jan. 15, 2019), acdis.org/articles/guest-post-distressing-terminology; *see also* Dr. Lee, *WDWN Medical Abbreviation: Meaning And When It Is Used*, MEDARCHIVE MAGAZINE (Nov. 2021), medarchivemagazine.com/wdwn-medical-abbreviation/ ("Acute distress . . . is used to describe a patient who is either in pain or who is exhibiting signs of respiratory difficulty. In such cases, the patient will be needing urgent intervention."). As such, "[p]atients may be sick, acutely ill, or

---

[8] Indeed, "giggling" could indicate a variety of emotions Claimant felt at the time, such as exasperation prompted by being asked to rate the pain he feels is debilitating, or simply nervousness. The ALJ gave no insight into why she noted this reaction.

14

injured, but not be in acute *distress*." Rodenberg, *supra* (emphasis in original). It therefore should be understood that noting a patient is in "no acute distress" is a mostly useless description that "provide[s] no information." Myles Sheehan, S.J., M.D., *General Appearance*, Patient Centered Medicine 2 (June 2005), meddean.luc.edu/lumen/meded/ipm/ipm2/sem3/general_appearance.pdf. Accordingly, the ALJ's reliance on the fact that Claimant's medical records contain the notation "no acute distress" as a reason to discredit his testimony is misplaced.

This is especially true when considering the additional information contained in the exhibits cited to by the ALJ. For example, Exhibit 2F/7 is a treatment note from September 2019, in which Claimant was "agitated" and "exhibit[ed] a depressed mood." [Dkt. 7-7 at 57.] His symptoms included fatigue, irritability, malaise, blurred vision, shortness of breath, chest pain, palpitations, polydipsia, polyphagia, impotence, arthralgias, neck pain, dizziness, headaches, confusion, decreased concentration, dysphoric mood, sleep disturbance, nervousness, and anxiousness. [Dkt. 7-7 at 56.] His diagnoses included uncontrolled type 2 diabetes mellitus with hyperglycemia, uncontrolled moderate episode of recurrent major depressive disorder, and uncontrolled generalized anxiety disorder, as well as chronic pain of left knee. [Dkt. 7-7 at 57.] Similarly, Exhibit 2F/38 is a treatment note from January 2020, in which Claimant "exhibit[ed] a depressed mood." [Dkt. 7-7 at 89.] His symptoms included fatigue, malaise, cough, sputum production, shortness of breath, chest wall pain, back pain, myalgias, headaches, depression, nervousness, and anxiousness. [Dkt. 7-7 at 88.] His diagnoses included uncontrolled type 2 diabetes mellitus with diabetic polyneuropathy, uncontrolled moderate episode of recurrent major depressive disorder, and worsening chronic airway disease. [Dkt. 7-7 at 89-90.] Exhibits 2F/25 and 2F/28 are notes from Claimant's hospitalization due to sepsis and pneumonia. Even though he is documented to be "in no acute distress" in Exhibit 2F/25, just a few lines down he is

15

noted as being in "mild respiratory distress." [Dkt. 7-7 at 75.] The ALJ does not acknowledge these notations, nor does she consider the remaining nine treatment notes in the record from Claimant's primary care physician that contain similar findings that corroborate Claimant's testimony about his subjective symptoms.

Following the boilerplate statements regarding Claimant's subjective symptoms, ALJ Tobin concluded that,

> [b]ased on the foregoing, the undersigned finds the claimant has the above residual functional capacity assessment, which is supported by the conservative treatment, the lack of specialized care for mental health impairments, the claimant's non-compliance with diabetic treatment, and the claimant's improvement with treatment.

[Dkt. 7-2 at 27.] However, these reasons cannot save the ALJ's decision.

As an initial point, ALJ Tobin fails to articulate what she considers to be "conservative" treatment and, further, what "improvement" she is referencing. This is especially important since Claimant was routinely diagnosed with multiple impairments, several of which ALJ Tobin found to be severe, each requiring and receiving different kinds of treatment. Because the ALJ did not connect specific evidence to her findings, the Court is unable to follow her reasoning on these points. In any case, "[s]imply because one is characterized as 'stable' or 'improving' does not necessarily mean that she is capable of doing light work." *Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014), *as amended* (Aug. 20, 2014).

Regarding Claimant's lack of mental health treatment and non-compliance with diabetic treatment, Claimant argues that it was error for the ALJ to discredit Claimant's subjective symptoms on these grounds without considering the reasons why he did not pursue mental health treatment and was sometimes noncompliant with diabetes treatment. [Dkt. 9 at 15.]

16

"[A]n ALJ may not draw negative inferences from a claimant's failure to seek treatment without first considering the individual's explanation." *McHenry*, 911 F.3d at 873 (citing *Beardsley v. Colvin*, 758 F.3d 834, 840 (7th Cir. 2014)). "[A]n ALJ has the burden of inquiry only when drawing inferences about the severity of a condition from the failure to seek or continue medical care," since the "lack of money or insurance might explain this possible discrepancy." *Id.* at 873-74 (citing *Beardsley*, 758 F.3d at 840). Understanding this, Claimant raises valid points. Specifically, he highlights his insurance issues and financial difficulties, as well as severe mental impairments, as factors that impeded his ability to obtain mental healthcare and fully adhere to treatment recommendations. [Dkt. 9 at 15-16.] Indeed, there are numerous places in the record where Claimant reveals that his financial difficulties prevented him from filling prescriptions. *See*, *e.g.*, [Dkt. 7-7 at 9] (Claimant stated "he had [run] out of [diabetic] meds about a week and a half earlier and had no money to pay for them" and "states he either had to pay rent or get meds filled"); [Dkt. 7-7 at 14] (Claimant "states he's not been checking his blood sugars, needs a new glucometer that he can afford strips for"); [Dkt. 7-7 at 34] (Claimant "was given samples of Trulicity 4 months ago but has not taken it since he ran out of samples at that time"); [Dkt. 7-7 at 41] (Claimant "unable to afford medications because of having had lost his job shortly after previous appointment" and "subsequently los[ing] his insurance"); [Dkt. 7-7 at 83] (Claimant "was previously on Lexapro but reports he was unable to afford it with his last insurance but his insurance has recently changed, he would like to restart this medication if possible"). It follows that financial barriers may have impacted his ability to seek mental health counseling, too—the ALJ should have asked Claimant about this during his hearing. Moreover, the ALJ's reliance on Claimant's non-compliance with his diabetic treatment overlooks

17

countervailing evidence in which he was reported to be "compliant with treatment most of the time" or "compliant with treatment all of the time." *See* [Dkt. 7-7 at 2, 15, 20, 96, 120].

Claimant additionally highlights that the ALJ did not consider the ways in which his severe mental impairments of recurrent major depressive disorder and generalized anxiety disorder—both of which were uncontrolled—may have prevented him from seeking and maintaining treatment. [Dkt. 9 at 16.] Indeed, mental illnesses "may prevent the sufferer from taking [his] prescribed medicines or otherwise submitting to treatment." *Kangail v. Barnhart, 454 F.3d 627, 630 (7th Cir. 2006)* (citations omitted); *see* M. Robin DiMatteo et al., *Depression Is a Risk Factor for Noncompliance With Medical Treatment*, 160 ARCH. INTERN. MED. 2101, 2103 (2000) (Mood disorders "that impair cognitive focus, energy, and motivation," such as generalized anxiety disorder and major depressive disorder, may "affect patients' willingness and ability to follow through with treatment.").[9] There is good reason to suspect that is what happened here. *See, e.g.*, [Dkt. 7-7 at 144] (noting that Claimant "reports he has been off almost all [h]is meds 'for too long' and has just recently restarted medications 2-3 weeks ago. Patient states he became severely depressed and stopped all his medications on his own").

In response, the Commissioner argues that the ALJ's subjective symptom evaluation need only "be minimally articulated" and "need not be perfect" to withstand review. [Dkt. 11 at 19]

---

[9] For example, generalized anxiety disorder "can be debilitating and interfere with chronic illness management via impaired concentration and low self-efficacy to complete illness self-management tasks." Zachary L. Mannes et al., *The association between symptoms of Generalized Anxiety Disorder and appointment adherence, overnight hospitalization, and emergency department/urgent care visits among adults living with HIV enrolled in care*, 42 J. BEHAV. MED. 330, 331 (2019). Similarly, "[d]epression often involves an applicable degree of hopelessness, and compliance might be difficult or impossible for a patient who holds little optimism that any action will be worthwhile." DiMatteo et al., *supra*, at 2105. In fact, "[c]ompared with nondepressed patients, the odds are 3 times greater that depressed patients will be noncompliant with medical treatment recommendations." *Id.* at 2101.

(citing *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009)). However, the Seventh Circuit has regularly reversed decisions where the ALJ's subjective symptoms evaluation (or, previously, credibility determination) is inadequately explained or based on a mischaracterization of the record. *See*, *e.g.*, *Plessinger v. Berryhill*, 900 F.3d 909, 916 (7th Cir. 2018) (reversing, in part, because "the ALJ did not really explain, for example, why he did not believe [the claimant's] testimony that he could not walk more than a very short distance and had to lie down several times during the day to manage his pain—testimony which, if believed, would preclude competitive employment according to the vocational expert"); *Perkins v. Astrue*, 498 F. App'x 641, 644 (7th Cir. 2013) (reversing, in part, because "the ALJ only briefly mentioned [the claimant's] dishonesty about his drug abuse, without explaining whether or how much this undermined [his] credibility," and "the ALJ noted [the claimant's] comment to a nurse that he walks a mile daily, but the ALJ again did not explain how his ability to walk one mile is inconsistent with the limitations that he claimed, or consistent with standing or walking for 6 hours of an 8–hour workday). Thus, regardless of the deferential standard, an ALJ is required to provide an actual explanation for her subjective symptom assessment that is accurately based on the evidence of record. The failure to do so is, and has always been, error.

     Ultimately, the ALJ chose to discredit Claimant's subjective symptoms based on his conservative treatment, lack of specialized mental healthcare, non-compliance with diabetic treatment, and improvement with treatment. [Dkt. 7-2 at 27.] However, it is unclear what ALJ Tobin considers to be conservative treatment or what treatment led to specific improvements and why those revelations weigh against Claimant's statements. Moreover, the ALJ failed to contemplate potential reasons for Claimant's non-compliance with his diabetic treatment and lack of mental health treatment. ALJ Tobin's decision is therefore devoid of the requisite logical

19

bridge between the evidence and her conclusions. As demonstrated here, ALJ Tobin's subjective symptoms evaluation is both inadequately explained and based on a mischaracterization of the record. The undersigned thus recommends that the decision be reversed.

## V. Conclusion

For the reasons set forth above, the undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED** and **REMANDED for further proceedings consistent with this Report and Recommendation**.

Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Failure to timely file objections within 14 days after service shall constitute waiver of subsequent review absent a showing of good cause for such failure.

SO ORDERED.

Dated: 26 APR 2022

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically
on all ECF-registered counsel of record via
email generated by the Court's ECF system.